UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

TODD P. EVANS, an individual,

Plaintiff,

v.

LANDER COUNTY HOSPITAL DISTRICT d/b/a BATTLE MOUNTAIN GENERAL HOSPITAL; and DOES 1 through 100, Inclusive,

Defendants.

Case No. 3:19-cv-00464-LRH-WGC

ORDER

Defendant, Lander County Hospital District d/b/a Battle Mountain General Hospital ("BMGH" or "the hospital") moves this Court for summary judgment. ECF No. 23. Plaintiff Todd ("TC") P. Evans opposed (ECF No. 26), and BMGH replied (ECF No. 29). For the reasons provided below, the Court grants BMGH's motion.

I. **BACKGROUND**

In late 2018, Evans interviewed for a full-time paramedic position at BMGH. ECF No. 26-3 at 18. During his in-person interview, he became aware that two other positions, a part-time paramedic and an EMS Education Coordinator, were also available. *Id.* at 18-19. Evans then called his interviewer, and soon-to-be supervisor, EMS Director Myra Wall, to propose a position where he take all three positions and work three 24-hour shifts in a row. *Id.* at 19-20.[1] Director Wall told Evans that she would need to discuss his proposal with Human Resources Director Kathy Freeman

---

[1] During the 72-hour shift, Evans testified he remained at the hospital in the living quarters, and when he was not "on calls," he was developing education materials, developing protocols, and sleeping, at his discretion. ECF No. 26-3 at 19-20.

and that she would get back to him. *Id.* at 20. Ultimately, Director Freeman called Evans and offered him his proposed position (full-time paramedic, part-time paramedic, and EMS Education Coordinator) for $27.50 per hour. *Id.* at 21. Evans testified that neither Director Wall nor Director Freeman indicated that his employment would be governed by a contract. *Id.* at 20-21. Evans testified that his proposal included that he would work the three-day shift for a five-year period. *Id.* at 33. While there is some dispute as to how his final pay rate was determined, (whether it was "renegotiated" and at what time), he was ultimately put into BMGH's system as a salaried employee at $115,00.00 per year. ECF No. 26-5 at 19-20. And Evans began working in the EMS department in late November 2018. ECF No. 26-3 at 21.

After he begun working, Evans requested a travel stipend. ECF No. 26-5 at 20. Director Freeman consulted with hospital CEO Jason Bleak and BMGH agreed to pay Evans a travel stipend of up to $500 per month, retroactive to his hiring. *Id.* at 20-21.

At some time between November 2018 and January 2019, Evans became aware that the EMS Department was operating in the "red." ECF No. 26-3 at 37. In approximately January 2019, Evans and Director Wall met with CEO Bleak, during which Evans proposed that the hospital hire the volunteer EMTs, thereby maximizing revenue by allowing the department to take more ground transfers. *Id.* at 36-37, 39-41. Evans suggested that this proposal would also avoid any potential violation to the Fair Labor Standards Act ("FLSA"). *Id.* Evans testified that he gave CEO Bleak FLSA fact sheets, but at his deposition, he could not remember what fact sheets he provided. ECF No. 41, 47, 59. CEO Bleak directed Evans to show him how his proposal would benefit the department and Evans wrote a follow-up memo to this meeting. *Id.* at 39, 48. The memo does not discuss any violations of the FLSA. *Id.*; ECF No. 23-9 at 36-40.

Evans testified that around March of 2019 EMT Mikel Harris asked him if he would like to speak with his cousin, Spencer Roberts, who was a member of the BMGH board of trustees. ECF No. 26-3 at 50. Evans testified that Director Wall then set up the meeting with Trustee Roberts and that he just attended. *Id.* In April 2019, Evans and Director Wall had an informal chat with Trustee Roberts, during which Evans presented a spreadsheet of different configurations of staffing that could be presented to the Board at the upcoming budget meeting. *Id.* at 50-51. Evans testified

that his FLSA concerns came up during this meeting, but he did not give Trustee Roberts any FLSA paperwork. *Id.* at 56, 58.

On May 1, 2019, CEO Bleak, Director Freeman, and Director Wall held a meeting with Evans to discuss his behavior. *Id.* at 64-65. During the meeting, CEO Bleak discussed Evans breaching the "chain of command" when he went to Trustee Spencer, being insubordinate to Director Wall, to remain within his job description, and to not speak with others about hospital business. *Id.* at 65-66. Following this meeting, Evans approached EMT Mikel Harris and told him "if he happened to run into his cousin, would he please ask him to stop using my name because I got my ass chewed." *Id.* at 67. EMT Harris relayed the message to Trustee Roberts, who felt Evans' conduct was retaliatory and aggressive. ECF No. 23-10 at 21. CEO Bleak became aware of the confrontation between EMT Harris and Evans and called Evans on May 4, 2019. ECF No. 26-3 at 67. Evans confirmed that he had made the statement and CEO Bleak placed Evans on administrative leave while an investigation was conducted. *Id.*

CEO Bleak began investigating Evans' behavior and found that he had yelled at Director Wall in the presence of others; failed to follow direct orders from Director Wall; was belittling and demeaning to a former employee, Christy Trujillo, had called her a "bitch,' and that when she left her position with the hospital, had articulated that she felt TC treated her differently and rudely because she is a woman. ECF No. 26-4 at 18-20; ECF No. 23-10 at 30-32. Based on his investigation, CEO Bleak determined that Evans should be terminated. ECF No. 26-4 at 19. Director Freeman called Evans on May 10, 2019, and informed him that he was being terminated for insubordination and insolent behavior. ECF No. 26-3 at 67-68. Evans subsequently received a formal termination letter. *Id.* at 68; ECF No. 23-11.

On August 8, 2019, Evans filed a complaint with this Federal Court, alleging five causes of action: (1) retaliatory discharge – FLSA retaliation 29 U.S.C. § 215; (2) tortious discharge – public policy tort; (3) intentional/ negligent infliction of emotional distress; (4) breach of contract; and (5) breach of implied covenant of good faith and fair dealing. ECF No. 1. Evans requests damages for lost wages and benefits, punitive damages, attorneys' fees and costs, as well as prejudgment and post-judgment interest and liquidated damages. *Id.* Following close of discovery,

the Defendant filed the pending motion for summary judgment on all causes of action. ECF No. 23.

II. **LEGAL STANDARD**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. "The mere existence of a scintilla of

evidence in support of the [party's] position [is] insufficient" to establish a genuine dispute; "there must be evidence on which the jury could reasonably find for the [party]." *Id.* at 252.

### III. DISCUSSION

**A. The Court grants Defendant's motion for summary judgment on Evans' first cause of action for FLSA retaliation, 29 U.S.C. § 215(a)(3).**

The Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, provides rules for employment practices, including setting standards for minimum wages, maximum hours, and overtime. The FLSA also prohibits retaliation and makes it unlawful for an employer to

> discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the Act], or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee[.]

29 U.S.C. § 215(a)(3). To decide an FLSA retaliation claim, courts in this District apply the *McDonnell Douglas* burden shifting test: first, the Court determines whether the plaintiff has established a prima facie case of retaliation; if so, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reasons for the action; if so, the burden shifts back to the plaintiff to show that the proffered reason is merely pretext. *See Marks v. David Saxe Prods., LLC*, Case No. 2:17-cv-02110-KJD-DJA, 2020 WL 4905541, at * 3 (D. Nev. Aug. 20, 2020); *Knuf v. ATC/VANCOM, Inc.*, Case No. CV-N-97-33-HDM (PHA), 1998 WL 390076, at *1 (D. Nev. May 15, 1998).

A plaintiff establishes a prima facie case of retaliation by showing (1) he engaged in an activity that is protected by the FLSA; (2) that he suffered a contemporaneous, adverse action by the employer; and (3) that a causal connection "exists between the employee's activity and the employer's adverse action." *Knuf*, 1998 WL 390076, at *1.

First, Evans alleges that the protected activity he engaged in was informing BMGH that it was violating the wage provisions of the FLSA and /or Nevada state law. ECF No. 1 ¶¶ 19-20, 26. The Court's analysis necessarily hinges on whether Evans' conduct constitutes a "filed complaint" within the meaning of the FLSA anti-retaliation statute. The Supreme Court articulates that filing a complaint requires "some degree of formality" and must provide the employer with "fair notice,"

meaning the "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). While such complaints may be made either in writing or orally, *id.* at 14, "not all amorphous expressions of discontent related to wages and hours constitute complaints filed within the meaning of § 215(a)(3)," *Lambert v. Ackerley*, 180 F.3d 997, 1007 (9th Cir. 1999). "Whether a complaint has been filed that provides adequate notice to the employer is a question 'to be resolved as a matter of factual analysis on a case-by-base basis.'" *Rosenfield v. GlobalTranz Enters., Inc.*, 811 F.3d 282, 286 (9th Cir. 2015) (quoting *Lambert*, 180 F.3d at 1008).

Here, Evans argues that on two separate occasions he informed BMGH that it was violating the FLSA: the first, at a January 2019 meeting with hospital CEO Jason Bleak and EMS Director Myra Wall; and the second, at an April 2019 meeting with Trustee Robert Spencer and EMS Director Myra Wall. The Court will separately address whether each meeting constituted "filling a compliant" under the FLSA anti-retaliation statute.

1. January 2019 Meeting

While there is some disagreement among the parties' witnesses whether the January 2019 conversation constituted a formal meeting, the Court will rely on plaintiffs' version of events. Evans testified that the purpose of the January 2019 meeting was to express to CEO Bleak that the EMS Department could save money by changing the volunteer EMTs to employees. ECF No. 26-3 at 44 ("I tried to express to Jason the fiscal possibility of --- of saving money in the long run because when you look at the --- what they were paying for any one of them for a trip --- trip to Reno, … they actually probably would save money[.]"). Evans testified that at this meeting he expressed to CEO Bleak that changing to his proposed model would also eliminate "any possibilities of any illegality with the current [volunteer] system." *Id.* at 36-37. Evans testified that he had done research and believed the hospital's volunteer program "potentially" violated the FLSA, and at this meeting, gave CEO Bleak some FLSA fact sheets. During his deposition, Evans was unable to identify which fact sheets he provided CEO Bleak at this meeting. *Id.* at 59. Evans testified that he did not articulate to CEO Bleak what was specifically illegal with the volunteer

6

EMT program, or what specific right was being violated by the way the program operated. *Id.* at 49. Following this meeting, Evans wrote a follow-up memo to CEO Bleak articulating that the purpose of his proposed plan was to maximize the utilization of the current staff and entice more staff. *Id.* at 48. This memo contained no references to potential FLSA violations. *Id.*

Based on Evans' testimony, the Court finds that Evans' statements during the January 2019 meeting do not constitute filing a complaint with the BMGH as contemplated by the FLSA anti-retaliation statute. The content of this meeting was the financial and economic status of the EMS Department and was focused on how Evans' suggested alterations to the department, including transitioning the volunteer EMTs to paid staff, would increase the hospital's profits. While Evans noted the volunteer program was potentially violating the FLSA, Evans did not articulate what right the hospital was allegedly violating or what was specifically illegal about the program. And when Evans took the time to write a follow up memo to this conversation, the memo did not contain any reference to his alleged FLSA violations. While Evans was not required to make his complaint in writing, it stands to reason that an employee who was asserting that his employer was violating federal and state law would include such a point in a follow up memo.

Further, a reasonable employer would not have understood Evans' statements as an assertion of rights protected by the FLSA from the context of this conversation. In reaching this conclusion, the Court necessarily considers Evans' job title and responsibilities as both are an important contextual element of the Court's analysis. *See Rosenfield*, 811 F.3d at 286 (reasoning that while a certain complaint filed by an entry level employee may almost certainly be considered as filing a complaint, that same report filed by a manager may conversely not be considered as filing a complaint). Here, Evans testified that as the assistant manager of the EMS Department, he was responsible for advising "the department manager of activities, needs, problems, and unusual events," and understood it was his duty to raise a change to policy in the EMS department. ECF No. 26-3 at 23-24, 29. However, he also testified that he had not reviewed the hospital's volunteer program policy because he did not believe he even knew one existed, and did not know how volunteers kept track of their time. *Id.* at 25. Given this context, particularly, his role in presenting policy changes and his lack of knowledge of the workings of the volunteer program, it is clear to

7

the Court that BMGH would not and could not have understood Evans' statements at the January 2019 meeting to be an assertion of rights protected by the FLSA. *See Rosenfield*, 811 F.3d at 286 ("Generally speaking, managers are in a different position vis-à-vis the employer than are other employees because (as relevant here) their employer expects them to voice work-related concerns and to suggest changes in policy to their superiors."). A reasonable employer would have seen Evans' statements as supporting his proposed budget plan with the added bonus of protecting the hospital from potential FLSA claims, not an assertion of the employment rights of the volunteer EMTs in the program. Accordingly, his statements cannot be considered a filed complaint under the FLSA anti-retaliation statute.

2. April 2019 Meeting

Evans also alleges that he complained that the volunteer EMT program was illegal at an April 2019 meeting with hospital board member Spencer Roberts and EMS Director Myra Wall. Evans testified:

> The purpose of the meeting was to discuss with Spencer the spreadsheet, the cost, the future, what our plans were going to be, how we as a department could be more fiscally responsible and more sustainable. Our big concern --- there's a lot of focus on money, but our big concern was staffing. We were out of staff and we couldn't – we couldn't get people to come be a part of the program because they weren't getting paid. And so we needed more staff. We needed more on-call staff. And so how could we obtain sustainability?

ECF No. 26-3 at 56. While Evans testified that "FLSA concerns came up; how the volunteers had been being handled in the past came up; sustainability came up; the future of the program came up and where we were going came up," Evans testified that he just told Mr. Spencer "there's a potential that we have some problems here, we could be in violation, and there's a better way." *Id.*[2] To his recollection, Evans testified that he did not give Mr. Spencer any FLSA documentation. *Id.* at 58.

---

[2] Q: Were you complaining to Mr. Roberts that there was a violation of the FLSA, or were you just expressing that there could be a potential illegality and that could be eliminated if you – if you hired the volunteers instead of using volunteers?
A: I was expressing a potential illegality.
Q: Okay, and then just generally that way; you weren't specific as to what that specific illegality was?
A: I was not."

ECF No. 26-3 at 58.

8

Again, based on Evans' testimony, the Court finds that Evans' statements during the April 2019 meeting do not constitute filling a complaint with the BMGH as contemplated by the FLSA anti-retaliation statute. The content of this meeting was the financial and economic status of the EMS Department and was focused on how Evans' suggested alterations to the department, including transitioning the volunteer EMTs to paid staff, would make the department more fiscally responsible and increase staff. While Evans did address the FLSA and again suggested that the volunteer program may be violating the federal statute, he did not specify an illegality related to the program and did not provide Trustee Roberts with any documentation related to the FLSA. A reasonable employer would have seen Evans' statements as an attempt to recruit a board member to support his budget proposal, not an assertion of the employment rights of the volunteer EMTs in the program. Accordingly, his statements cannot be considered a filed complaint under the FLSA anti-retaliation statute.

Because the first element of Evans' retaliation claim fails, Evans cannot prove his prima facia case. The Court sees no reason to address the additional elements of the claim or analyze the rest of the *McDonnel Douglas* burden shifting framework. Accordingly, the Court grants Defendant summary judgment on Evans' first cause of action.

**B. The Court grants Defendant's motion for summary judgment on Evans' second cause of action for tortious discharge.**

Evans alleges tortious discharge (public policy tort) when he was terminated after raising his concerns regarding a potential FLSA violation. "An employer commits a tortious discharge by terminating an employee for reasons which violate public policy." *D'Angelo v. Gardner*, 819 P.2d 206, 212 (Nev. 1991). "Discharging an employee for seeking industrial insurance benefits, for performing jury duty or for refusing to violate the law are examples of tortious discharge." *Id.* However, tortious discharge claims are not permitted for at-will employees, except "in those rare and exceptional cases where the employer's conduct violates strong and compelling public policy." *Wayment v. Holmes*, 912 P.2d 816, 818 (1996) (quoting *Sands Regent v. Valgardson*, 777 P.2d 898, 900 (1989)). Further, a plaintiff may only recover under a tortious discharge theory where the

protected activity is *the* proximate cause of the termination. *Allum v. Valley Bank of Nev.*, 970 P.2d 1062, 1066 (Nev. 1998).

While the parties dispute whether Evans was an at-will employee the Court need not decide this issue to reach its conclusion on this cause of action.[3] The Court found above that Evans failed to file a complaint with the BMGH. Accordingly, his reporting the alleged FLSA violation, i.e., the protected activity, cannot be the proximate cause of his discharge, and his second cause of action must necessarily fail as a matter of law.

C. **The Court grants Defendant's motion for summary judgment on Evans' third cause of action for intentional infliction of emotional distress and negligent infliction of emotional distress.**

Plaintiff's third cause of action alleges intentional and negligent infliction of emotional distress. To prevail on a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must prove "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual and proximate causation." *Star v. Rabello*, 625 P.2d 90, 91-92 (Nev. 1981).

Here, the Court does not find that terminating Evans was extreme and outrageous conduct. "[E]xtreme and outrageous conduct is that which is 'outside all possible bounds of decency' and is regarded as 'utterly intolerable in a civilized community.'" *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (quoting BAJI 12.74). Termination, without more, simply does not reach this level of extreme and outrageous conduct. *See Alam v. Reno Hilton Corp.*, 819 F.Supp. 905, 911 (D. Nev. 1993) (finding that "termination of employees, even in the context of a discriminatory policy, does not in itself amount to extreme and outrageous conduct actionable under an intentional infliction of emotional distress theory.").

Evans further fails to provide support that he suffered severe or extreme emotional distress. Severe emotional distress means stress "so severe and of such intensity that no reasonable person could be expected to endure it." *Id.* Evans testified during his deposition that he had not sought

---

[3] The Court does find that Evans was an at-will employee and discusses its reasoning and conclusion below in relation to Evans' fourth cause of action for breach of contract. *See* Part III.D.

10

medical care or psychological or psychiatric care as a result of his termination. ECF No. 26-3 at 69. In his response to Interrogatory number 19, he provided:

> I have not been treated or examined by a health care practitioner for emotion or mental distress. However, I cannot begin to describe how humiliating it is to, for the first time in my life, answer in the affirmative on job applications whether I have ever been terminated from a job. . . . I have suffered the humiliation of losing my job, career, and retirement for standing up for the people and the system I worked for. To try and describe the stress, pain, and suffering associated with the increased strain and stress on my marital relationship and the relationship with my children is difficult at best. There have been increased fights, struggles, and worries as everyone tries to figure out what is wrong with me.

ECF No. 26-7 at 15.

The Court is sympathetic to plaintiff's feelings; however, neither stress nor humiliation is sufficient to support an IIED claim in Nevada. *See Kennedy v. Carriage Cemetery Services, Inc.*, 727 F.Supp.2d 925, 933 (D. Nev. 2010) (finding that "[i]nsomnia and nightmares standing alone will not support an IIED claim in Nevada."); *Miller v. Jones*, 970 P.2d 571, 577 (1998) (upholding the lower court's summary judgment ruling on plaintiff's IIED claim because while plaintiff was depressed, "he did not seek any medical or psychiatric assistance," and did not present any "objectively verifiable indicia of the severity of his emotional distress."); *Alam*, 819 F.Supp. at 911 (finding that "plaintiffs' feelings of inferiority, headaches, irritability and in the case of one plaintiff the loss of ten pounds," did not amount to severe emotional distress). As the first two elements of Evans' IIED claim fail, the Court must grant Defendant's motion for summary judgment.

To prevail on a claim for negligent infliction of emotional distress ("NIED") in a Nevada, a "witness-plaintiff must prove that he or she (1) was located near the scene; (2) was emotionally injured by the contemporaneous sensory observance of the accident; and (3) was closely related to the victim." *Kennedy*, 727 F.Supp.2d at 934 (quoting *Grotts v. Zahner*, 989 P.2d 415, 416 (1999)). While the Nevada Supreme Court indicated that it recognizes torts for both IIED and NIED in the context of wrongful employment termination, *see State v. Eighth Judicial Dist. Court ex rel. County of Clark*, 42 P.3d 233, 241 (2002), a close reading of the case provides that the Court "was not referring to NIED as a separate cause of action, but rather was referring to the fact that damages can be recovered for emotional harm stemming from other intentional or negligent torts," *Kennedy*,

727 F.Supp.2d at 934. Accordingly, only a bystander plaintiff may bring an NIED claim. *See Garcia v. Nevada Property 1, LLC*, Case No. 2:14-CV-1707 JCM (GWF), 2015 WL 67019, at *3 (D. Nev. 2015) ("In Nevada, NIED claims may be brought only by bystander plaintiffs."); *Does 1 through VI v. KTNV-Channel 13*, 863 F.Supp 1259, 1264 (D. Nev. 1994) ("This Court, however, has repeatedly held that Nevada does not recognize an independent cause of action for negligent infliction of emotional distress, except in bystander cases.").

There can be no dispute that Evans is not a bystander. Accordingly, his NIED claim fails as a matter of law, and the Court grants Defendant's motion for summary judgment on Evans' third cause of action.

**D. The Court grants Defendant's motion for summary judgment on Evans' fourth cause of action, breach of contract, and fifth cause of action, breach of implied covenant of good faith and fair dealing.**

Evans' fourth cause of action alleges Defendant breached its oral employment contract in which BMGH agreed to pay Evans a salary of $115,000.00 per year plus a travel stipend of no more than $500.00 per month. ECF No. 1 ¶¶ 55-58. Defendant argues that it could not have breached an employment contract that did not exist as Evans was an at-will employee. Having reviewed the record, there can be no dispute that Evans was an at-will employee.

In Nevada, there is a presumption that employment is at-will. *See Yeager v. Harrah's Club, Inc.*, 897 P.2d 1093, 1095 (Nev. 1995). Evans argues that when BMGH created a position for him that had not previously existed and changed his salary from hourly to salaried plus a monthly travel stipend, BMGH showed it intended to contract with him. He also alleges that when he proposed taking all three open positions (full-time paramedic, part-time paramedic, and EMS Education Coordinator), he said he would do it for 5-years. However, an email exchange between Evans and Human Resources Director Kathy Freeman directly articulates to Evans that he was an at-will employee. ECF No. 23-9 at 7 ("What you would not expect to see in any at will employment state is an employee address administration in such a condescending manner."). Evans does not reference a five-year commitment in this email exchange and testified that even after being told he was an at-will employee, he did not dispute this status with Director Freeman or pursue the issue further. ECF No. 26-3 at 33. Had Evans believed he was under contract, and had agreed to work a

five-year period, a reasonable employee would have raised such an important question with Human Resources, or at the very least, his direct supervisor upon finding out otherwise.

Even if he was a contract employee, the evidence further shows that Evans, like all hospital employees, was required to complete an initial one-year introductory period. *See* ECF No. 23-9 at 22. While Evans disputes that he was aware of this probationary period, the record shows that he signed an acknowledgement that he received BMGH's personnel policies and procedure manual on November 19, 2018. ECF No. 23-9 at 20. Evans was terminated in May 2019; therefore, he was still within his one-year introductory period. Given this evidence, the Court finds that Evans has failed to rebut the presumption of at-will employment. If his employment was at-will, there could be no breach of contract, and therefore, his fourth cause of action necessarily fails as a matter of law.

Finally, Evans alleges BMGH breached the implied covenant of good faith and fair dealing. However, this claim necessarily must fail absent a contractual relationship. *Alam*, 819 F.Supp. at 910 ("Before a covenant of good faith and fair dealing can be implied not only there must be a breach of an employment contract, there must be a determination of a special relationship in which special reliance, trust and dependency is part."). Because the Court finds that Evans was an at-will employee and no contractual relationship existed between himself and BMGH, his fifth cause of action fails as a matter of law.

IV. **CONCLUSION**

IT IS THEREFORE ORDERED that Defendant's motion for summary judgment (ECF No. 23) is **GRANTED.**

IT IS FURTHER ORDERED that the Clerk of Court is to **ENTER JUDGMENT** in favor of Defendant and against Plaintiff on all causes of action and close this case.

IT IS SO ORDERED.

DATED this 13th day of May, 2021.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE